IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

HOLDINGS, INC.,

      Plaintiff,

      v.

SELECT ENERGY SERVICES, LLC, and
RED OAK TRANSFER NE, LLC,

      Defendants.

21cv1579
ELECTRONICALLY FILED

**Memorandum Opinion on Motions for (Partial) Summary Judgment**

**I.    Introduction**

This is a civil action alleging breach of contract and tort claims by Plaintiff, Holdings, Inc., ("Holdings"), the Landlord (leasor) of commercial real estate property, against Defendants, the Tenants (leasees), Select Energy Services, LLLC ("Select Energy") and Red Oak Water Transfer NE, LLC ("Red Oak"). The commercial real estate property at issue was subject to Lease Agreements between Plaintiff and Defendants, for maintenance and storage of equipment for use in the oilfield industry.  The property was damaged and returned to Plaintiff at the lease conclusion after its substantially defaced condition was allegedly concealed to Plaintiff.

Although not characterized by Defendants as a "Partial," currently pending before this Court are Defendants' "Partial" Motions for Summary Judgment on Counts III through VIII of the Second Amended Complaint primarily on the basis of the judicially-created, "gist of the action doctrine;" and, on the contractual issue of Plaintiff's claim for attorney's fees pursuant to the "indemnification" clause as contained in the Lease Agreements (doc. 59 and doc. 63).

1

Plaintiff, however, opposes the Motions for Summary Judgment and cites the Court's prior Memorandum Order on the Motion to Dismiss, among other cases, as basis for its opposition.

At the Motion to Dismiss stage of the proceedings, this Court ruled that that the gist of the action doctrine did not apply to bar the tort claims at issue, and permitted the parties to proceed with discovery, at least as an alternative form of relief.  After permitting Plaintiff's tort claims to proceed through discovery, this Court agrees with Defendants, who have filed Motions for Summary Judgment as to the tort claims, on the basis that the Lease Agreements between the parties create and define both the nature and scope of the duties of Defendants (as Tenants) to maintain the property and its fixtures in good repair.

The Court also finds that the parties have often taken paradoxical views with regard to the duties outlined in the contracts.  On the one hand, in opposing Defendants' Motions for Summary Judgment, Plaintiff contends that the Lease Agreements at issue are merely collateral to the dispute, and that the societal duty not to damage another person's property compels the advancement of the tort claims to trial, yet it also seeks to proceed with the breach of contract claims, which could lead to double recoveries (doc. 71.). On the other hand, Plaintiff then contends that the same leases do not adequately spell out the basic duties of Defendants to keep the property in good repair; but then, Plaintiff relies on the "indemnification" clauses within the Lease Agreements to compel Defendants to pay Plaintiff's attorney's fees.

At points during this litigation, Defendants have also advanced paradoxical positions on the applicability of the Lease Agreements that set forth the obligation of Defendants to maintain the premises in good repairs.  However, in Defendants' Reply, they seemingly state that the parties no longer dispute the applicability of the contractual language as contained in the Lease Agreements.  At this juncture, because Defendants have not moved for summary judgment on

the underlying breach of contract actions, the Court surmises that the issue of liability for the alleged breaches and the extent of the damages sustained in the course of the Lease Agreements are trial issues.

Judging the facts in the light most favorable to Plaintiff, as the non-moving party, this Court cannot escape the conclusion that the plain and unambiguous terms of the subject Lease Agreements set forth the nature and scope of the duties to "maintain the Premises in good repairs at all times." Therefore, the contractual language is not collateral to the dispute here, and instead is intertwined with, or sets forth, the nature of the duties of Defendants. The Court finds that the contractual duties outlined in the Lease Agreements govern this dispute, and the breach of contract claims are merely "masquerading," as tort claims.

Therefore, for the reasons that follow, the Court will grant summary judgment in favor of Defendants, as to Counts III through VIII of the Second Amended Complaint; and also, will grant summary judgment in favor of Defendants on the portion of Plaintiff's breach of contract action relating to attorney's fees, because the plain language of the indemnification clauses cannot be read to cover Plaintiff's attorney's fees claim. However, Plaintiff's breach of contract claims (Counts I and II) remain viable. By separate Order of Court, the Court will Order the parties to proceed to a second round of mediation.

## II.   Procedural History

This civil action was originally filed in the Court of Common Pleas of Washington County, Pennsylvania, and was properly removed by Defendant, Select Energy (due to diversity of citizenship jurisdiction). Select Energy promptly then filed a Motion to Dismiss Counts II through V of the original Complaint (primarily on the basis that the gist of the action sounds in contract and thus the tort claims must be dismissed), and Answer to Count I of the Complaint

(breach of contract) (doc. 10).   In response, Plaintiff filed its First Amended Complaint, also adding claims against Red Oak, and thereby mooting the original Motion to Dismiss (doc. 14).

Defendants Red Oak, and Select Energy then filed Partial Motions to Dismiss (doc. 23 and doc. 26) Counts IV through VIII and III through VIII, respectively, of the First Amended Complaint (and request for punitive damages), again primarily on the basis that the gist of the action doctrine, bars the tort claims at issue.  Plaintiff responded in opposition thereto (doc. 31).

At the Motion to Dismiss phase of the proceedings, this Court thoroughly analyzed and reviewed the factual allegations and denied the Motions to Dismiss by Memorandum Order (doc. 32).  This Court found that a dismissal at this stage was not only inappropriate because Plaintiff had a right to alternative pleading, but also, because to dismiss the tort claims at that time would have allowed Defendants to advance the paradoxical position that the contracts create no duty to return the property in an undamaged state, and that Defendants also had no societal duty to prevent waste and damage.  *Id.*

After analyzing *Bruno v. Erie Insurance Company*, 106 A.3d 48, 53 (Pa. 2014), the most recent Pennsylvania Supreme Court case on point, this Court found that "Plaintiff's First Amended Complaint properly alleges that the Defendants violated societal duties imposed by tort law, including the duties not to create a private nuisance, waste and not to negligently damage Plaintiff's personal property."  *Id.*

This Court found that the gist of the action doctrine did not apply at the Motion to Dismiss phase, because the duties imposed on Defendants not to damage the property "plausibly exists," regardless of the Lease Agreements.  Importantly, this Court noted that "at this early stage of the proceedings, this Court simply cannot state that there is no plausible claim for at least alternative relief as to the tort claims in this case, as well as the claims for punitive

damages." This Court therefore joined a number of other courts who noted that a decision on the applicability of the gist of the action doctrine is best reserved for summary judgment (doc. 32).

Having concluded the discovery process, Defendants have now filed Motions for (Partial) Summary Judgment, seeking to dismiss the tort claims, and one aspect of the breach of contract action, (doc. 59 and doc. 63), Plaintiff has opposed said Motions by Omnibus Response in Opposition (doc. 71), and the Court permitted Defendants to file a five (5) page Reply (doc. 75). After providing the parties the opportunity to fully develop the facts (doc. 76), the Court cannot escape the conclusion that the terms of the contracts dictate the dispute between the parties. The Lease Agreements are not merely collateral to the dispute, but instead create the duties of the parties to the contracts and set forth that Tenants have the duty to maintain the premises "in good repairs at all times."

### III.    Standard of Review

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010).

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, (1986); *see also Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). Disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning there is sufficient evidence supporting the claimed factual dispute "to require a jury or judge to resolve the parties' differing versions of the truth at trial. *In re*

Case 2:21-cv-01579-AJS   Document 81   Filed 09/01/22   Page 6 of 24

*Lemington Home for Aged*, 659 F.3d 282, 290 (3d Cir. 2011); *see also S.H. ex rel. Durrell v. Lower Merion School Dist.*, 729 F.3d 248 (3d Cir. 2013).

A party moving for summary judgment has the initial burden of supporting its assertion that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the record – i.e., depositions, documents, affidavits, stipulations, or other materials – or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its fact(s). Fed.R.Civ.P. 56(c)(1). The moving party may discharge its burden by "pointing out to the district court" the "absence of evidence to support the nonmoving party's case" when the nonmoving party bears the ultimate burden of proof for the claim in question. *Conoshenti v. Public Service Elec. & Gas Co*, 364 F.3d 135, 140 (3d Cir. 2004) (quoting *Singletary v. Pennsylvania Dept. of Corrections*, 266 F.3d 186, 192 n. 2 (3d Cir. 2001)).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that fact(s) are genuinely disputed by citing to particular parts of materials in the record, or by showing that: (1) the materials cited by the moving party do not establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s). Fed.R.Civ.P. 56(c)(1). When determining whether there are any genuine issues of material fact, all inferences should be drawn in favor of the non-moving party. *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

In reviewing a motion for summary judgment, the Court does not make credibility determinations, and summary judgment is "inappropriate when a case will turn on credibility determinations." *El v. Southeastern Pennsylvania Transp. Authority*, 479 F.3d 232 (3d Cir. 2007).

IV.    **Background Facts**

The parties have amassed 113 pages of factual materials, which are neither joint nor concise, and many of which are disputed (doc. 76).  Judging the facts in the light most favorable to Plaintiff, as the non-moving party, the factual background may be fairly stated as follows.

Holdings is the owner of a commercial property located at 375 and 378 Walker Road, Canonsburg, Pennsylvania, having purchased the property in 1998-1999.  There are two buildings on the property at issue, with the larger building at 375 Walker Road, and the smaller building at 378 Walker Road.  Greg Dunn, Sr. (father), the owner and only employee of Holdings, purchased it after performing reclamation work on the property.  Greg Dunn, Jr. (son) does the paperwork for Holdings (doc. 76).

Prior to the leases at issue in this case, the subject property was rented to two other tenants.  Holdings leased the 375 Walker Road property to Arrow, an oil and gas company, and the 378 Walker Road property to Lighthouse Electric (doc. 76 at paragraph 6).

Pursuant to a valid Lease Agreement, on November 13, 2013 to October 31, 2018, Red Oak leased from Holdings the property at 375 Walker Road, and also leased the smaller building at 378 for a portion of the Red Oak Lease.  A copy of that Lease is attached to Plaintiff's Second Amended Complaint as Exhibit B, and will be further outlined below.

Red Oak was purchased by Select Energy in November of 2017 (doc. 76 at paragraph 28).  Upon the conclusion of the Red Oak Lease term, Select Energy and Holdings entered into a Lease Agreement of both properties at 375 and 378 Walker Road, from November 1, 2018 to March 31, 2020. The parties agree that the Select Lease may have been extended for a period of roughly one month after March 31, 2020.  A copy of that Lease is also attached to Plaintiff's

Second Amended Complaint as Exhibit A, the particulars of which will be discussed below (doc. 76 at paragraphs 8-11).

The parties agree that "there is no dispute as to the authenticity of the Red Oak and Select [Energy] Leases."  However, it appears that there is still a dispute as to whether Defendants had a duty under the Lease Agreements not to damage the property (the contracts do not address whether the duty relates to negligent or intentional damage) (doc. 76 at paragraph 12).

While Holdings claims that Red Oak and Select Energy damaged the properties during the course of the Leases in material breach of the Lease Agreements and through negligent and intentional tortuous conduct, Red Oak and Select Energy counter that the damage to the properties was the result of reasonable or normal wear and tear under the "permitted use" as Defendants used the leased premises for repair and rebuilding of equipment used in oil and gas field operations.  Defendants contends that the property was not "new, pristine or unmarked at the commencement of the 2013 lease" (doc. 76 at page 37, paragraph 1).

A.  <u>The Red Oak Lease Agreement</u>

The Lease Agreement between Tenant, Red Oak and, Landlord, Holdings, contains the following material provisions:

The Lease Agreement was dated October 17, 2013, and the lease term ran from November 1, 2013 to October 31, 2018, for a five (5) year lease term, which was renewable by the Landlord for an additional three (3) years.  The rent was $6,500.00 per month, with a security deposit of $6,500.00 payable upon execution.  The lease premises was listed as a "building at 375 Walker Road containing approximately 10,4000 square feet located on approximately 3 acres of land."  The permitted use was listed as "maintenance and storage of oilfield equipment." Landlord agreed to perform certain maintenance and repairs as listed in an attached exhibit and

the governing law was listed as "Washington County[,] Pennsylvania" (doc. 48-2).  Following a page of the key provisions listed above, there are 20 numbered paragraphs containing all other Lease terms.  The Lease Agreement was signed by David Nightingale, the CEO of Red Oak, and Greg Dunn, Sr., the owner of Holdings, and included four (4) additional exhibits containing a photo of the lease premises, renewal option, termination option and a list of landlord improvements to be completed prior to move-in date.  Of particular note to the pending Motions for Summary Judgment, are the following lease terms:

> 5.  <u>Maintenance</u>:  During the term of this Lease, Landlord shall be responsible to maintain the building, if any, in good repair at all times.  Tenant shall have the responsibility to (i) maintain the Premises and any fixture place thereon in good repairs at all times, (ii) remove snow and (iii) cut the grass on the Premises.
>
> \*          \*          \*
>
> 7.  <u>Indemnity</u>:  Tenant shall hold Landlord, its trustees, Affiliates, subsidiaries, members, principals, beneficiaries, partners, officers, directors, shareholders, employees, Mortgagees, and agents (collectively "Landlord Parties") harmless from and indemnify and defend such parties against all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including reasonable attorney's fees and other professional fees that may be imposed upon, incurred by or asserted against any of such indemnified party (each a "Claim" and collectively "Claims" ) that arise out of or in connection with any damages or injury occurring in the Premises.  EVEN IF SUCH LIABILITIES ARE CAUSE SOLELY OR IN PARTY BY THE ORDINARY NEGLIGENCE OF A LANDLORD PARTY, BUT NOT THE EXTENT SUCH LIABILITIES ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A LANDLORD PARTY.

Doc. 48-2.

B.   The Select Energy Lease Agreement

The Lease Agreement between Tenant, Select Energy and, Landlord, Holdings, contains the following material provisions:

The Lease Agreement was dated October 31, 2018, and the lease term ran from November 1, 2018 to March 31, 2020, for a 17-month lease term (doc. 48-1).  The rent was

$16,000.00 per month, with a security deposit of $6,500.00 "already being held by Landlord." The lease premises was listed as: "the two (2) buildings that contain, in the aggregate, approximately 16,400 square feet located on approximately 5.0 acres, as indicated on the Attached exhibit A." Just like the prior lease, the permitted use was listed as "[m]aintenance and storage of oilfield equipment."  The governing law was also listed as "Washington County[,] Pennsylvania."  Following a page of the key provisions listed above, there are 20 numbered paragraphs containing all other Lease terms.  The Lease Agreement was signed by Gary Gillette, SVP and Chief Administrative Officer of Select Energy, and Gregory Dunn, Sr., the owner of Holdings, and included two (2) additional exhibits containing a photo of the lease premises, and a certificate of liability insurance by Holdings.  Of particular note to the pending Motions for Summary Judgment, are the following lease terms, which are the same as the Lease Agreement with Red Oak, with the exception of the last sentence in all caps in paragraph 7:

> 5. <u>Maintenance</u>:  During the term of this Lease, Landlord shall be responsible to maintain the building, if any, in good repair at all times.  Tenant shall have the responsibility to (i) maintain the Premises and any fixture place thereon in good repairs at all times, (ii) remove snow and (iii) cut the grass on the Premises.
>
>       *      *      *
>
> 7. <u>Indemnity</u>:  Tenant shall hold Landlord, its trustees, Affiliates, subsidiaries, members, principals, beneficiaries, partners, officers, directors, shareholders, employees, Mortgagees, and agents (collectively "Landlord Parties") harmless from and indemnify and defend such parties against all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including reasonable attorney's fees and other professional fees that may be imposed upon, incurred by or asserted against any of such indemnified party (each a "Claim" and collectively "Claims" ) that arise out of or in connection with any damages of injury occurring in the Premises.  BUT NOT THE EXTENT SUCH LIABILITIES ARE CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF A LANDLORD PARTY, TO WHICH THE LANDLORD SHALL HOLD TENANT AND ITS AFFILIATES, EMPLOYEES AND OTHER AGENTS HARMLESS FROM AND INDEMNIFY AND DEFEND SUCH PARTIES AGAINST ALL CLAIMS (AS DEFINED ABOVE).

Doc. 48-1.

    C.   Gas and Oilfield Work Performed and Damages on the Premises

The parties agree that Defendants used the leased premises for "maintenance and storage of oilfield equipment" (which Defendants characterize as "repair and rebuilding" of equipment used in the oil and gas field operations,) that Defendants employed between 30 to 70 employees who were affiliated with the Property, and that it was a base of operations for a large service area (doc. 76 at paragraph 19; page 37 at paragraphs 4 and 6).  Select Energy had more than 20 pickup trucks at the Property (in February of 2020) (doc. 76 at page 37, paragraph 3).

Equipment re-build at 375 Walker Road included test separators, which were used to separate oil or gas from water.  Select Energy also worked with metal pipes rated for 15,000 pounds of pressure, and they worked with a wide variety of "iron" parts on site, including 10-foot (by 2-4 inches in diameter) sections of pipes that had oil, gas, water and sand flow through them.  Rebuilding equipment could include work with valves.

The parties dispute whether jackhammers were used at the property, with Defendants' witnesses contending they did not use them, and Plaintiff 's witnesses testifying that jackhammers were used on the floors.  Tightening a valve for pressure-testing would require the use of a sledgehammer, and the parties agree that sledgehammers were used at the property, possibly on the floor (doc. 76 at paragraphs 20-24; page 40, paragraph 20 and page 41, paragraph 21).  Defendants' business used a "tremendous amount of grease in repair" of their equipment (doc. 76 at page 40, paragraph 13).  The general paint theme for Select Energy is red and there was red paint on the walls, as well as splatters of blue paint (doc. 76 at page 41, paragraphs 16-19).

The corporate designee of Defendant, Scott Yeates, did not have knowledge that anyone other than employees of Select Energy or Red Oak caused the conditions shown in the photographs of the property (evidencing damage to the property), but instead testified that the floor was not in "great condition when the [Defendants] got there" (doc. 76 at pages 42-43, paragraph 23).

Plaintiff's expert, Bob Seman, testified that the damages to the floors of the property were "probably one of the worst damaged floors," he had ever seen (doc. 76 at paragraph 31). He also testified that the tests he performed on the floor demonstrated that the floors were of hard, good and solid concrete, prior to the damage, which he characterized as "abuse" (doc. 76 at page 47, paragraphs 30-33). Mr. Seman essentially testified that the damage was intentional, reckless, and violated industry standards, and Defendants argue that Plaintiff's expert has no basis for an opinion on industry standards or contains inadmissible conclusions of law (doc. 76 at page 51, paragraphs 34-39). Defendants counter by stating that the damages resulted from reasonable wear and tear, not from inappropriate (impermissible) use (doc. 76 at page 54, paragraph 42).

Mark Teegarden, who worked for 26 years for Liberty Lumber in Canonsburg, Pennsylvania, did repair work for Plaintiff prior to the Lease Agreements, and also testified to the damages on the walls. The parties agree that Mr. Teegarden never personally witnessed anyone throwing bolts at the drywall on the premises, but he also testified that it looked like Defendants "played target practice on the wall of the Property by standing back and throwing bolts through the wall" (doc. 76 at page 61, paragraph 58). Defendants do not deny that some of the damage to the walls was caused by them, but they deny that it was reckless, intentional, or concealed (instead, it was reasonable wear and tear) (doc. 76 at page 61, paragraphs 50-59).

Plaintiff has hundreds of photographs of the property and the damages thereon, which Plaintiff contends demonstrates that Defendants' conduct was reckless and intentional. Defendants admit some of the damages were caused by them, but counter that they are part of reasonable wear and tear, and were neither reckless nor intentional, or were they concealed (doc. 76 at pages 68-97).  The parties also agree that Defendants did not discipline any of their employees for the alleged damages the property, and did not issue a stop order to cease damaging the floor.

D.   Repairs Undertaken by Defendants

Defendants performed semi-routine cleaning tasks at the property, including degreasing, but according to Plaintiff's expert (and photographs), there was grease "everywhere" (doc. 76 at paragraph 43).  Either Red Oak or Select Energy replaced the main entrance door for 375 Walker Road, but Holdings contends that the remote control for the replacement did not work properly and had to be further repaired (doc. 76 at paragraph 44).  Select Energy also repaired the garage door for the building at 378 Walker Road, but Holdings argues that it still had to be "corrected" (doc. 76 at paragraph 45).  Defendants installed cubicles and painted the second-floor office area at 375 Walker Road.  Additionally, Defendants performed landscaping, including planting hedges, and upkeep of trimming shrubs, and weed whacking.  Defendants installed an automatic gate on the premises, but this was done without permission, and according to Plaintiff, it is difficult to use (doc. 76 at paragraphs 46-49).  Either Red Oak or Select Energy installed security cameras inside and outside of the building.  However, the footage from these cameras was not maintained by Defendants (doc. 76 at paragraph 50).

E.   Conclusion of Lease Term

Defendants are no longer in possession of the property, did not abandon the Leases, and paid the rent due under the Lease Agreements.   At the conclusion of the Select Energy Lease, during the final walk-through, owner of Holdings, Greg Dunn, Sr., addressed the problems with the property with Select Energy.  While the parties agree that Plaintiff was not denied access to the property during the Leases, Plaintiff contends that it was not able to access or view numerous areas, including floors and walls because they were covered by Defendants' equipment. Therefore, according to Plaintiff, it was not until the conclusion of the Select Energy lease, that the damages were viewed.  During the Red Oak Lease, a hole in the roof was found by Greg Dunn, Sr., and Red Oak subsequently paid for the repair.  While Greg Dunn, Sr. did not visit the office area of 378 Walker Road prior to the start of the Red Oak Lease, and did not visit the property between the end of the Red Oak Lease and the start of the Select Energy Lease, there were no items listed for repair in the Select Energy Lease, and the Defendants equipment covered up the areas of alleged damages.

F.   Prospective Tenant

Following the conclusion of the Select Energy Lease, Plaintiff was contacted by a potential tenant for the properties at 375 and 378 Walker Road, but after viewing the property, but offered a low amount of rent possibly based upon the damage to the property (the tenant did not speak English).  Plaintiff chose not to accept the offer because it did not want to offer the property for rent while in a "perpetually damaged state"  (doc. 76 at page 35, paragraphs 58-59).

G.   Plaintiff's Second Amended Complaint

Holding's Second Amended Complaint set forth claims as follows:  Count I, Breach of Contract against Select Energy; Count II, Breach of Contract against Red Oak and Select Energy; Count III – Negligence against Select Energy; Count IV – Negligence against Red Oak

and Select Energy; Count V – Private Nuisance against Red Oak and Select Energy; Count VI –
Trespass on Land against Red Oak and Select Energy; Count VII, Trespass to Personal
Property/Chattel against Red Oak and Select Energy; and Count VIII, Waste against Red Oak
and Select Energy (doc. 48).  Holdings also seeks attorney's fees in this matter under the breach
of contract counts of its Second Amended Complaint as well as costs such as extensive
deposition costs and expert fees.

## V.     Discussion

### A.   Gist of the Action Doctrine Bars Tort Claims from Proceeding to Trial

(i)     Caselaw

A federal court exercising diversity jurisdiction is bound by the *Erie* doctrine to follow
state law as announced by the highest state court.  *Wayne Moving & Storage of New Jersey, Inc.
v. School Dist. of Philadelphia*, 625 F.3d 148, 154 (3d Cir. 2010).  If the state's highest court has
not addressed the precise question presented, the federal court must predict how the state's
highest court would resolve the issue.  *Id.*

The Pennsylvania Supreme Court reviewed the precedent on the gist of the action
doctrine and reaffirmed the standard by which to determine whether or not a plaintiff's claim is
"truly one in tort, or for breach of contract."  *Bruno v. Erie Ins. Co.*, 106 A.3d 48 (Pa. 2014).
The Pennsylvania Supreme Court summarized the test as follows:

> The general governing principle which can be derived from our
> prior cases is that our Court has consistently regarded the nature of
> the duty alleged to have been breached, as established by the
> underlying averments supporting the claim in a plaintiff's
> complaint, to be the critical determinative factor in determining
> whether the claim is truly one in tort, or for breach of contract.  In
> this regard, the substance of the allegations comprising a claim in a
> plaintiff's complaint are of paramount importance, and, thus, the
> mere labeling by the plaintiff of a claim as being in tort, e.g., for

> negligence, is not controlling.  If the facts of a particular claim
> establish that the duty breached is one created by the parties by the
> terms of their contract—i.e., a specific promise to do something
> that a party would not ordinarily be obligated to do but for the
> existence of the contract—then the claim is to be viewed as one for
> breach of contract.  If, however, the facts establish that the claim
> involved the defendant's violation of a broader social duty owed to
> all individuals, which is imposed by the law of torts and, hence,
> exists regardless of the contract, then it must be regarded as a tort.

*Bruno*, 106 A.3d at 111-112 (internal citations omitted).

In *Earl v. NVR, Inc.*, 20-2109, 20-505 at doc. 29-2 (3d Cir. March 2021), the United

States Court of Appeals for the Third Circuit also analyzed the Bruno case.  *Earl* is another civil

case currently pending before this Court upon remand for reversal of a grant of a Motion to

Dismiss on the basis of the gist of the action doctrine.  *Earl* is factually and legally distinctive

from the case *sub judice* because the claims in *Earl* are for violation of the Unfair Trade

Practices and Consumer Protection Law ("UTPCPL") on the basis of alleged false and fraudulent

misrepresentations.

Whereas, here, the claims originate wholly in contract and in tort (Counts I and II –

Breach of Contract, Count III and IV – Negligence, Counts V – Private Nuisance, Counts VI –

Trespass on Land, Count VII - Trespass to Personal Property and Count VIII – Waste).

Nonetheless, the following recitation by the Court of Appeals is instructive:

> The gist of the action doctrine provides that "an alleged tort claim
> against a party to a contract, based on the party's actions undertaken in the
> course of carrying out a contractual agreement, is barred when the gist or
> gravamen of the cause of action stated in the complaint, although sounding in
> tort, is, in actuality, a claim against the party for breach of its contractual
> obligations." *Dixon*, 146 A.3d at 788 (quoting *Bruno v. Erie Ins. Co.,* 630 Pa.
> 79, 106 A.3d 48, 53 (2014) (footnotes omitted)).  In *Bruno,* the Pennsylvania
> Supreme Court established the following test for applying the gist of the action
> doctrine:

If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract—i.e., a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract—then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

*Bruno*, 106 A.3d at 68 (citations omitted).

If read expansively, the doctrine could plausibly be understood to bar the instant action, given the existence of a contract between Earl and NVR involving the purchase and construction of the Home. Earl's complaint is not primarily premised upon the terms of the contract, however, but on the marketing and representations that induced her to enter into the contract in the first instance, as well as statements made to her by agents of NVR during the homebuilding process. *Knight is* once again illustrative for our purposes, as the Court encountered a similar set of facts and determined the gist of the action doctrine did not apply:

> Although she purchased the vehicle pursuant to the contract, the alleged representations by Appellees occurred prior the signing of any contract. Furthermore, the above false advertisements, statements, and assurances are rendered unlawful by sections 201–2(4)(v), (vii), (ix), (xi), and (xxi) of the UTPCPL. These are not masked claims for breach of contract; the gist of the action here is in tort, and the contract is collateral to the matters alleged. As such, the gist of the action doctrine did not warrant the dismissal of Knight's UTPCPL claims.

*Knight*, 81 A.3d at 951 (internal citations omitted). As did the plaintiff in *Knight*, Earl alleges NVR made false representations to her about the Home prior to the formation of the contract (in terms of how the Home was "marketed"), in further discussions held during the contract period, and while the Home was in the process of being constructed. Earl also alleges that NVR made false representations after the contract period, once she moved into the house. These alleged actions are collateral to the terms of the contract itself.

While the allegations here and in *Knight* both sound in fraud rather than negligence, in *Dixon* the Superior Court determined that even UTPCPL claims grounded in negligence may not be barred by the gist of the action doctrine:

Deceptive conduct ordinarily can only take one of two forms, either fraudulent or negligent. As noted above, the pre–1996 catchall provision covered only fraudulently deceptive practices. The broadening of the UTPCPL so as to not require fraud therefore ipso facto makes negligent deception, e.g., negligent misrepresentations, actionable under the post–1996 catchall provision.

*Dixon*, 146 A.3d at 790. The *Dixon* Court consequently allowed the plaintiff's claims there to go forward, and both *Dixon* and *Knight* thus suggest that the gist of the action doctrine should not preclude liability under the UTPCPL where the contract is collateral to any allegedly deceptive conduct, as has been alleged in this case. We therefore hold that the gist of the action doctrine does not bar Earl's UTPCPL claim from going forward.

*Earl v. NVR, Inc.*, 20-2109, 20-505 at doc. 29-2 (3d Cir. March 2021).

Additionally, although this Court's prior opinion in *Onconome v. University of Pittsburgh,* 09-cv-1195 (doc. 35) (December 17, 2009) predated the Pennsylvania Supreme Court's pronouncements on the gist of the action defense in *Bruno*, the underpinnings of this doctrine are discussed at length and are still instructive:

In general, Pennsylvania courts are cautious about permitting tort recovery on contractual breaches. *Glazer v. Chandler*, 414 Pa. 304, 200 A.2d 416, 418 (1964). The gist of the action defense forecloses a party's pursuit of a trespass (tort) action for mere breach of contractual duties, in the absence of any separate or independent event giving rise to the tort. *Air Prods. and Chems., Inc. v. Eaton Metal Prods. Co.*, 256 F.Supp.2d 329, 340 (E.D.Pa. 2003).

The gist of the action defense is not absolute, however, and the simple existence of a contractual relationship between two parties does not preclude one party from bringing a tort claim against the other where such claim is collateral to the contract claim and arises from some social duty rather than the contractual relationship. *Bohler-Uddeholm*, 247 F.3d at 104. The *eToll* Court concluded that the gist-of-the-action doctrine would apply to bar a claim for fraud in the performance of a contract, but it also observed that fraud "in the inducement of a contract would not necessarily be covered" by the gist-of-the-action doctrine, because "fraud to induce a person to enter into a contract is generally collateral to (i.e., not 'interwoven' with) the terms of the contract itself." *eToll*, 811 A.2d at 17 (quoted in *Air Prods.*, 256 F.Supp.2d at 341.

While it is true that the gist of the action doctrine will not bar all fraud in the inducement claims, "the particular theory of fraud – whether it lies in inducement or performance – is not dispositive." *Guy Chemical Co., Inc. v. Romaco N.V.*, 2007 WL 184782, *5-*6 (W.D. Pa. 2007); see also *Owen J. Roberts Sch. Dist. v. HTE, Inc.*, 2003 WL 735098, *2, n. 4 (E.D.Pa. 2003) (applying the gist of the action doctrine to bar a fraud in the inducement claim where the pre-contractual statements regarding ability to supply software in a timely manner were ultimately addressed in the contract); *Galdieri v. Monsanto Co.*, 245 F.Supp.2d 636, 650  (E.D.Pa. 2002) (dismissing the plaintiff's fraudulent inducement claim under the gist of the action doctrine where the alleged fraud was that the defendant never intended to perform; a "breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced' or alleging the contracting parties never intended to perform.'") (quoting *Pinkert v. John J. Olivieri, P.A.*, 2001 WL 641737, *5 (D.Del. 2001)).  Rather, the test to be applied to claims of fraud in the inducement remains the same as that set forth in *eToll*, and the focus of analysis under this doctrine is whether actions lie from a breach of the duties imposed as a matter of social policy or from the breach of duties imposed by mutual consensus pursuant to contract.

"[F]raud in the inducement claims are much more likely to present cases in which a social policy against the fraud, external to the contractual obligations of the parties, exists." *Air Prods.*, 256 F.Supp. 2d at 341 (citing *Foster v. Northwestern Mutual Life*, 2002 WL 31991114, *2-*4 (E.D.Pa. 2002).  As Judge Ambrose stated in the *Lombardi* case, a "number of courts, including Pennsylvania appellate courts and district courts in this Circuit, have held that claims of fraud in the inducement, under certain factual situations, were not collateral to the contract claim, and therefore, were not barred by the gist of the action doctrine.  See, e.g., *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 719 (Pa.Super. 2005) (fraud claim was not barred by gist of the action doctrine where plaintiff alleged that the defendant fraudulently and/or negligently agreed to perform obligations that it never intended to perform in order to induce plaintiff to agree to proposed changes in his compensation package and to forego an immediate resignation);  *Air Prods.*, 256 F.Supp.2d at 342  . . ."  *Lombardi*, 2009 WL 1811540 at *8 (additional citations omitted).

*Onconome v. University of Pittsburgh*, 09-cv-1195 (doc. 35)(December 17, 2009).

(b)    Application

The question before this Court remains whether the nature of the duties to upkeep the

property is grounded in the contracts between the parties, or whether there is a societal duty,

outside of the contract or collateral to it, to keep the property in good repair.  Crucial to this

Court's analysis of whether the alleged tortuous conduct is collateral to the contracts, the Court is compelled to examine the operative contractual language against the factual claims in this case.

The Lease Agreements attached as Exhibit A and B to Plaintiff's Second Amended Complaint (doc.48-1 and doc. 48-2) both contain the following material terms with respect to "Maintenance" of the subject property:

> 5. <u>Maintenance</u>:  During the term of this Lease, Landlord shall be responsible to maintain the building, if any, in good repair at all times.  Tenant shall have the responsibility to (i) maintain the Premises and any fixtures places thereon in good repairs at all times, (ii) remove snow and (iii) cut the grass on the Premises.

Id.

The terms of the Lease Agreements required Tenants (Red Oak and Select Energy) to maintain the Premises in good repairs at all times.  The duty to not damage the property emanates from the terms of the contracts, and the tort claims are not collateral to the allegations of the Second Amended Complaint, or the factual allegations contained therein.  While Plaintiff's factual claims are dressed up as tort claims, Defendants' damages to the property, in allegedly failing to maintain or keep the Premises in good repair, if proven, constitutes potential breaches of the contracts at issue.  These terms were bargained for and agreed upon by the contracting parties and any other tort claims are nothing more than a recasting of a mutual consensus and contractual agreement into potential common law tort claims.

This dispute centers upon the contractual language as contained in paragraph 5 of the Lease Agreements.  In other words, the Lease Agreements are inextricably intertwined with the contracts at issue and spell out the duties of Defendants to maintain the premises in good repair. The four corners of the contracts define the scope of the duties of the parties, and the contract to

which the parties agreed to be bound, does not parse out whether the Defendants acted recklessly, intentionally, or unreasonably.

Instead, the Lease Agreements spell out the responsibilities and legal duties of Tenants to keep the Premises "in good repairs at all times."  In other words, the state of mind of Defendants does not matter because the contracts elucidate the parties' legal responsibilities and the parties are confined to the terms thereof, as the bargained for exchange between two commercial entities.   The conduct of the parties, and the potential liability for damages sustained falls squarely within the four corners of the Lease Agreements, and the Court will confine the claims for trial to the breach of contract action herein.

      B.   <u>Breach of Contract – Plaintiff's Request for Attorney's Fees and Costs</u>

The Lease Agreement between Holdings and Red Oak contains the following provision:

> 7.   <u>Indemnity</u>:  Tenant shall hold Landlord, its trustees, Affiliates, subsidiaries, members, principals, beneficiaries, partners, officers, directors, shareholders, employees, Mortgagees, and agents (collectively "Landlord Parties") harmless from and indemnify and defend such parties against all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including reasonable attorney's fees and other professional fees that may be imposed upon, incurred by or asserted against any of such indemnified party (each a "Claim" and collectively "Claims" ) that arise out of or in connection with any damages of injury occurring in the Premises.  EVEN IF SUCH LIABILITIES ARE CAUSE SOLELY OR IN PARTY BY THE ORDINARY NEGLIGENCE OF A LANDLORD PARTY, BUT NOT THE EXTENT SUCH LIABILITIES ARE CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF A LANDLORD PARTY.

Doc. 48-2.

Likewise, the Lease Agreement between Holdings and Select Energy contains the following provisions:

> 7.   <u>Indemnity</u>:  Tenant shall hold Landlord, its trustees, Affiliates, subsidiaries, members, principals, beneficiaries, partners, officers, directors, shareholders, employees, Mortgagees, and agents (collectively "Landlord Parties") harmless from and indemnify and defend such parties against all liabilities, obligations,

damages, penalties, claims, actions, costs, charges and expenses, including reasonable attorney's fees and other professional fees that may be imposed upon, incurred by or asserted against any of such indemnified party (each a "Claim" and collectively "Claims" ) that arise out of or in connection with any damages or injury occurring in the Premises.  BUT NOT THE EXTENT SUCH LIABILITIES ARE CAUSED BY THE NEGLIGENCE, GROSS NEGLIGENCE, OR WILLFUL MISCONDUCT OF A LANDLORD PARTY, TO WHICH THE LANDLORD SHALL HOLD TENANT AND ITS AFFILIATES, EMPLOYEES AND OTHER AGENTS HARMLESS FROM AND INDEMNIFY AND DEFEND SUCH PARTIES AGAINST ALL CLAIMS (AS DEFINED ABOVE).

Doc. 48-1.

Plaintiff contends that these provisions require Defendants to pay Plaintiff's attorney's fees and the costs of this litigation.  As Defendants emphasize, and this Court agrees, the general rule under Pennsylvania law is that "each side is responsible for the payment of its own costs and counsel fees absent bad faith or vexatious conduct."  *Lucchino v. Commonwealth*, 809 A.2d 264, 267 (Pa. 2002). According to the "American Rule," a litigant cannot recover counsel fees absent express statutory authority, a clear agreement of the parties, or some other established exception.

Plaintiff does not argue that there is statutory authority for counsel fees in this case. Instead, it contends that the contractual language in paragraph 7 of the Lease Agreements – titled "Indemnity," constitutes an agreement for fee shifting.  This Court disagrees.

The plain text of the Lease Agreements unmistakably guides the process of seeking indemnification in the context of a third-party claim, in the event that Plaintiff is sued for "damages or injury occurring in the premises," not for first-party claims brought by Plaintiff against the Tenants.  Although Plaintiff contends that first-party indemnification is applicable here, the Court does not agree that the language above evinces this result.  The Court, however, does not disagree that indemnification literally means "to compensate," as set forth in *Dansko Holdings, Inc. v. Benefit Trust Co*., 991 F.3d 494. 502-503 (3d Cir. 2021).  The indemnification

language at issue in *Dansko* is much broader and therefore distinguishable from the Lease Agreements here which literally states that "Tenant . . . shall hold Landlord . . . harmless from, indemnify and defend such parties against all liabilities . . . including reasonable attorney's fees and other professional fees that may be imposed upon, incurred by or asserted against any of such indemnified party (each a "Claim" and collectively "Claims" ) that arise out of or in connection with any damages or injury occurring in the Premises"  (doc. 48-1 and doc. 48-2).

The use of the term "indemnify" in the context of the Lease Agreements, does not contemplate first party claims, nor does the surrounding language "harmless from . . . and defend such parties against all liability."  The plain language of the Lease Agreements, including the capitalized concluding sentences that explain that indemnification does not apply for gross negligence of the Landlord does not support Plaintiff's reading of the contracts.  Simply put, Paragraph 7 of the Lease Agreements simply does not support Plaintiff's claim for attorney's fees and costs.

**VI.     Conclusion**

Judging the facts in the light most favorable to Plaintiff, as the non-moving party, this Court cannot escape the conclusion that the plain and unambiguous terms of the Lease Agreements govern this dispute, and any damages for any tort claims would merely duplicate the damages for the breach of contract claims (with the exception of punitive damages, which are generally unavailable under a breach of contract claim).  *Rittenhouse Regency Affiliates v. Passen*, 482 A.2d 1042, 1043 (Pa. Super. 1984).  Additionally, the plain language of the Lease Agreements does not evidence that the parties agreed for Plaintiff to seek attorney's fees and costs against Defendants under a first-party "indemnification" theory.

Therefore, the Court will grant Defendants' Motions for Summary Judgment on Counts III through VIII of the Second Amended Complaint; also, will grant Defendants' Motions for Summary Judgment on to the issue of attorney's fees and costs.  An appropriate Order follows.

SO ORDERED, this 1st day of September, 2022

/s Arthur J. Schwab_____
Arthur J. Schwab
United States District Judge

cc:  All counsel of record